UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| KURT DAVIS, | CASE NO. 5:17CV68 |
| Plaintiff, | JUDGE SOLOMON OLIVER, JR. |
| v. | Magistrate Judge George J. Limbert |
| NANCY A. BERRYHILL[1], ACTING COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE |
| Defendant. | |

Plaintiff Kurt Davis ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security Administration ("Defendant") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  ECF Dkt. #1. In his brief on the merits, filed on April 17, 2017, Plaintiff asserts that the administrative law judge's ("ALJ") analysis of his mental impairments and residual functional capacity ("RFC") lacked the support of substantial evidence.  ECF Dkt. #10.  Defendant filed a response brief on June 28, 2017.  ECF Dkt. #13.  Plaintiff filed a reply brief on July 10, 2017.  ECF Dkt. #14.

For the following reasons, the undersigned RECOMMENDS that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case in its entirety with prejudice.

## I.  PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI in November 2013 alleging that he had been disabled since birth.  ECF Dkt. #9 at 226-27.[2]  The applications were denied initially and upon reconsideration, and Plaintiff requested a hearing before an ALJ.  *Id.* at 106, 176.  Prior to the

---

[1]On January 23, 2017, Nancy A. Berryhill became the acting Commissioner of Social Security, replacing Carolyn W. Colvin.

[2]All citations to the Transcript refer to the page numbers assigned when the Transcript was filed as a .PDF, rather that the page numbers assigned by the CM/ECF system.  When the Transcript was filed the .PDF included an index, with the indexed pages differentiated from the numerical pages.  Accordingly, the page number assigned in the .PDF mirrors the page number printed on each page of the Transcript, rather than the page number assigned when the Transcript was filed in the CM/ECF system.

hearing, Plaintiff amended the alleged disability onset date to December 19, 2012. *Id.* at 322. The hearing in this matter was held on September 15, 2015. *Id.* at 61. On December 7, 2015, the ALJ issued a decision denying Plaintiff's claims. *Id.* at 39. Subsequently, the Appeals Council denied Plaintiff's request for review. *Id.* at 1. Accordingly, the December 7, 2015, decision issued by the ALJ stands as the final decision.

The instant suit was filed by Plaintiff on January 10, 2017. ECF Dkt. #1. On April 17, 2017, Plaintiff filed a brief on the merits. ECF Dkt. #10. Defendant filed a response brief on June 28, 2017. ECF Dkt. #13. Plaintiff filed a reply brief on July 10, 2017. ECF Dkt. #14.

## II.     RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE

### A.     Medical Evidence

Plaintiff suffered a skull fracture as an infant and underwent a craniectomy with evacuation of epidural hematoma at seven weeks of age. Tr. at 373. At age six, Plaintiff was placed in special education classes. *Id.* at 480-94. While in the tenth grade, Plaintiff was re-evaluated for special education placement and found eligible for "Specific Learning Disabilities Program Services." *Id.* at 461. During the re-evaluation, it was noted that Plaintiff had average cognitive ability, but difficulty paying attention to information presented verbally for sustained time periods, and that he required additional time to master concepts and complete assignments. *Id.*

In January 2014, Plaintiff was evaluated by state consultative psychologist James M. Lyall, Ph.D.[3] Tr. at 382-87. Dr. Lyall stated the Plaintiff: displayed some mild difficulty understanding complicated questions; indicated that he was generally calm but became confused in new social situations; stated that handling money was a little bit confusing and that his parents helped manage his finances; may have had some judgment difficulties based on his less-than-average intelligence; and seemed to have some insight into his cognitive difficulties. *Id.* at 384. Continuing, Dr. Lyall assessed that Plaintiff scored within the extremely low range on tests of

---

[3]Plaintiff does not contest the ALJ's findings with respect to his physical limitations and instead focuses on his mental limitations. *See* ECF Dkt. #10. Accordingly, the instant Report and Recommendation only addresses the medical evidence related to Plaintiff's mental impairments.

working memory and may have had difficulty handling work pressures at his various jobs over the years, "most probably due to his less than average intelligence." *Id.* at 386. Dr. Lyall also stated that Plaintiff had some behavioral problems when younger, but it appeared that he was able to relate to others adequately at the time of the evaluation, especially when others "treat[ed] him properly." *Id.*

On January 31, 2014, state agency reviewing physician Irma Johnston, Psy.D., opined that Plaintiff would be limited to jobs involving simple, one- to two-step instructions without a fast pace or high production quotas, and a work environment with infrequent changes in routine that could be easily explained. Tr. at 112-14, 123-25. Paul Tangeman, Ph.D., reviewed Plaintiff's updated record and affirmed Dr. Johnston's opinion on April 16, 2014. *Id.* at 137-38, 148-49.

Plaintiff reported left-sided motor and cognitive problems to Frank Lazzerini, M.D., on July 14, 2014. Tr. at 401. On examination, Dr. Lazzerini found left-sided weakness with strength of 2/5 and abnormal gait. *Id.* at 401. On July 29, 2014, Dr. Lazzerini noted normal examination findings, but stated that "patient is medically disabled." *Id.* at 398-400. Plaintiff underwent physical and occupational therapy at the order of Dr. Lazzerini for his left hand, gait, balance, ataxia, sensory processing, and learning disability compensation from October 2014 through July 2015. *Id.* at 427-28, 508-26, 551-831.

On November 10, 2014, Plaintiff reported to Andrew Stalker, M.D., that he had difficulty maintaining employment and had been fired twelve times for reasons such as being slow and sleeping on the job. Tr. at 418. Plaintiff also stated that he had issues interacting with others. *Id.* Continuing, Plaintiff explained that he lived in an apartment owned by a friend of his family and that his family had to help him with all of his activities of daily living. *Id.* Dr. Stalked noted largely normal findings, but also indicated that Plaintiff had abnormal memory, abnormal fund of knowledge, mild motor weakness of the left hand, and decreased alternating movement speed on his left. *Id.* at 420. At the order of Dr. Stalker, Plaintiff underwent an electroencephalogram on November 18, 2014, that resulted in normal findings, although it was noted that epilepsy could not be ruled out. *Id.* at 417. On December 3, 2014, Plaintiff underwent a computerized tomography scan that showed encephalomalacia and post-surgical changes of the right partial

lobe. *Id.* at 416, 440. Plaintiff returned to Dr. Stalker on December 8, 2014, and it was noted that Plaintiff was having problems with his prior traumatic brain injury, including cognitive and emotional problems, and that there was little that could be done beyond psychiatry to help his mood. *Id.* at 415.

On December 17, 2014, Plaintiff reported to his therapist that he "blam[ed] his brain" for his problems and it was noted that he "[a]ttributes problems to brain injury that are coping or denial." Tr. at 789. The therapist indicated that Plaintiff needed to focus on his learning disability instead of his general brain injury problems that could not be corrected. *Id.* at 777. In early January 2015, Plaintiff reported that he was trying to better himself, but it was noted by the therapist that he had missed job appointments and blamed his job coach. *Id.* at 683.

On January 21, 2015, Robert Devies, Ph.D., performed a neuropsychological evaluation of Plaintiff. Tr. at 424-25, 442-43. Plaintiff indicated that he had graduated high school, during which he took part in a vocational program focused on agriculture. *Id.* at 424, 442. Continuing, Plaintiff reported that he had a difficulty maintaining employment and a history of attention deficit disorder. *Id.* Plaintiff told Dr. Davies that he was "slow learning to do new stuff" and that he could "follow a task after watching it completed but [could not] learn to do something on his own." *Id.* Dr. Davies noted that Plaintiff had little insight and understanding of his own dynamics, and that otherwise the only observed behavior that was atypical was a fairly significant dyscalculia. *Id.*

Plaintiff saw Rajnikant Kothari, M.D., on January 27, 2015, for a psychiatric consultation. Tr. at 445. At the consultation Plaintiff reported that he was prescribed Zoloft, Zyprexa, and phenobarbital, but that he "didn't really take them" because he did not like the side effects. *Id.* at 447. Plaintiff reported that his hobbies included working on cars, fishing and hunting, and singing karaoke with friends. *Id.* at 450. Dr. Kothari noted that Plaintiff: was unkempt; displayed a temperamental mood and affect; had antisocial attitudes and blamed others; had a below average intellect; displayed an inability to concentrate; and showed poor insight and judgment. *Id.* at 451-52. Plaintiff was diagnosed with bipolar disorder and Dr. Kothari noted that he refused to be treated. *Id.* at 453.

On February 17, 2015, Plaintiff reported to Dr. Lazzerini that he had been to a psychiatric consultation, but that the psychiatrist wanted to prescribe medicine. Tr. at 429. Plaintiff stated that he refused the medicine and would not be returning for a follow-up visit. *Id*. Dr. Lazzerini completed a medical-source statement regarding Plaintiff's physical and mental abilities. *Id.* at 496, 503. With respect to Plaintiff's mental abilities, Dr. Lazzerini opined that Plaintiff was: moderately limited in his ability to understand and remember simple instructions; markedly limited in his ability to carry out simple instructions, make judgments on simple work-related decisions, and understand and remember complex instructions; and extremely limited in his ability to carry out complex instructions and to make judgments on complex work-related decisions. *Id.* at 503. Continuing, Dr. Lazzerini opined that Plaintiff: was moderately limited in his ability to interact appropriately with the public and supervisors, and to respond appropriately to usual work situations and changes in a routine work setting; was markedly limited in his ability to interact appropriately with supervisors; and would miss more than four days per month due to mental impairments. *Id.* at 504-505.

Plaintiff reported to his therapist in May 2015 that he had not followed up on resumes submitted in an effort to find employment and did not have a plan, but that he had found a job mowing lawns for a small trailer park. Tr. at 736. The therapist counseled Plaintiff on realistic job expectations and his continued dependency on others, and indicated that he was too passive and disorganized for long-term work and needed to determine a specific goal. *Id.* In July 2015, it was noted that Plaintiff was developing organizational skills for thinking and life, and that he had made good progress towards establishing a long-term work plan. *Id.* at 770.

### B. Hearing Evidence

On September 15, 2015, the ALJ held a hearing with Plaintiff, his attorney, and a vocational expert ("VE") present. Tr. at 61. The ALJ examined Plaintiff, who testified that he had been mowing lawns once a week for a month during that summer. *Id.* at 70. Plaintiff testified that he had previously worked as a milker on a farm for almost four years and that prior to that job he had worked as a sandblaster for "maybe a year, maybe more." *Id.* at 72. According to Plaintiff, he worked at a temporary agency prior to the sandblasting job. *Id.* at 72-73.

Plaintiff then testified that he had lived alone for about four years and that he drove only when necessary. Tr. at 75-76. Regarding his daily activities, Plaintiff testified that he: cleaned dishes; threw horseshoes; shot his bow; watched a little television; ate meals; met with friends on weekends to "go to a couple bars and go relax and have fun": helped his father with "boat stuff"; cooked and shopped for himself; and cleaned his apartment. *Id*. at 76-77. When asked about his travel, Plaintiff testified that it had been a while since he last left Ohio and that he had recently traveled within Ohio for a fishing trip with his father. *Id*. at 77. Continuing, Plaintiff indicated that he graduated from high school, sometimes read novels, and did not use a computer. *Id.* at 77-78.

The ALJ then asked Plaintiff why he could not return to work after he was fired from his job on the farm. Tr. at 78. Plaintiff testified that he had problems with his left knee, and maybe his whole left leg, and that he could not walk or stand for long periods of time. *Id.* Continuing, Plaintiff stated that he also had problems his whole life with his left side and that these problems caused him to have difficulty using his left hand. *Id.* at 78-79. Plaintiff indicated that the problems with his left side had not changed over the course of his life. *Id.* at 79. Next, Plaintiff testified that he was good at learning about history, hunting, fishing, "working on things," and that if he took an item apart he could put it back together, but that he took "a while to compute" other tasks. *Id.* at 80. Plaintiff stated that needed to have someone show him how to perform tasks, and that "once [he got] rolling [he was] pretty good." *Id.*

When asked about lifting and carrying, Plaintiff indicated that he had been having some difficulty for the prior few weeks due to pressure and cramps in his left leg. *Id.* at 81. Plaintiff testified that prior to the pressure and cramping he had been experiencing for a few week, he did not have any problems lifting, carrying, walking, or standing. *Id.* at 82. When asked about his finances and ability to manage money, Plaintiff stated that he received some financial aid from his father and grandfather and that he had problems managing money when he was younger. *Id.* at 83. Plaintiff also indicated that he was not required to pay rent for his apartment since it was owned by friends of his family. *Id.* The ALJ then asked Plaintiff about his temper, and he testified that "[d]epending on the situation [he could] get hot-headed." *Id.* at 84.

-6-

Next, Plaintiff was examined by his attorney. Tr. at 84. On examination, Plaintiff testified that he performed his own cleaning and owned a vehicle that his parents helped finance. *Id.* at 87. Plaintiff stated that his parents gave him rides approximately eighty-percent of the time because he was not good with directions. *Id*. at 88. Continuing, Plaintiff stated that he had dated a woman recently for a couple of months, but that the relationship had ended. *Id.*

After the examination, Plaintiff's attorney examined his mother, Julia Davis. Tr. at 93. Ms. Davis testified that she had not been inside Plaintiff's apartment because "prior apartments [she had] seen [had] been really terrible messy." [sic] *Id.* Continuing, Ms. Davis stated that Plaintiff: could not manage his finances; had been fired about a dozen times for being slow and for problems understanding "a lot of things"; required assistance in many areas of his life; and had only been able to keep his job on the farm for four years as a result of his father's repeated intervention with the employer. *Id.* at 94-96. The ALJ then examined Ms. Davis. *Id.* at 97. Ms. Davis testified that Plaintiff: mowed the lawn once in a while, if necessary; helped build a platform blower with his father; liked to shoot his bow and fish; and spent time with his friends having bonfires or attending festivals. *Id.* at 97-98.

The ALJ then examined the VE. Tr. at 99. On examination, the VE testified that Plaintiff had performed work as a screen printer, sandblaster, and milking machine operator. *Id.* The ALJ then posed a series of hypothetical individuals with varying degrees of limitation to the VE. *Id.* For each hypothetical individual, the VE identified jobs that existed in significant numbers in the national economy that such an individual would be capable of performing. *Id.* at 100-103. After examining the VE, the ALJ noted that additional records were forthcoming and that Plaintiff's attorney could brief the records, if desired. *Id.* at 104. The ALJ then concluded the hearing. *Id.*

### C. Post-Hearing Evidence

After the hearing, the ALJ ordered two consultative examinations of Plaintiff. On October 28, 2015, Plaintiff underwent a psychological evaluation with William Mohler, M.A. Tr. at 842. Plaintiff was diagnosed with major neurocognitive disorder due to traumatic brain injury, and it was noted that the prognosis was stable and that his intellectual levels were "very unlikely to change." *Id.* at 845. Mr. Mohler also indicated that Plaintiff: would be "well below

-7-

individuals with borderline intellectual functioning"; would have some difficulty maintaining persistence and pace for simple tasks, and considerable difficulty with multi-step tasks; could potentially maintain focus on tasks that were simple and repetitive; and would have considerable difficulty problem solving in an effort to adjust to unexpected stressors in the work environment and would require excessive support and guidance in adjusting to even simple changes in work tasks. *Id.* at 845-46.

On October 29, 2015, Plaintiff underwent a nerurological evaluation with Dariush Saghafi, M.D. Tr. at 833. Dr. Saghafi noted that Plaintiff had been "good in school," liked wood shop, played varsity sports, hunted with a bow and arrow, and was a good marksman with a rifle. *Id.* Continuing, Dr. Saghafi indicated that Plaintiff was oriented, fluent, and articulate. *Id.* at 834. Dr. Saghafi also stated that Plaintiff: had dirt and grime underneath his fingernails, suggesting the ability to work with his hands and perform physical activities; was articulate and "comprehend[ed] everything"; did not have any difficulty with calculation; displayed normal short-term memory, and intact repetition and naming; had normal motor and sensory responses; and was neurologically intact with "a clear handicap when it comes to reading and writing comprehension." *Id.* at 834-35. No exertional limitations were found. *Id.* at 835.

Plaintiff's mother, Ms. Davis, submitted written remarks on November 6, 2015, in response to the consultative examination reports. Tr. at 340-41. Ms. Davis stated that Plaintiff did not play varsity sports and that he had a "tendency to talk big about himself." *Id.* at 340. Continuing, Ms. Davis explained that Plaintiff did not have any education after high school and that the agricultural program he participated in was a vocational program during high school. *Id.* Additionally, Ms. Davis stated that the dirt and grime under Plaintiff's fingernails, as noted by Dr. Saghai, was due to his poor hygiene rather than physical work. *Id.*

### III.     RELEVANT PORTIONS OF THE ALJ'S DECISION

The ALJ issued a decision on December 7, 2015. Tr. at 39. In the decision, the ALJ stated that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2017. *Id.* at 44. Continuing, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since December 19, 2012, the amended alleged onset date. *Id.* The

ALJ then found that Plaintiff had the following severe impairments: organic brain disorder due to intracranial injury; learning disorder/cognitive disorder; generalized anxiety disorder; and bipolar disorder, mixed with psychotic features. *Id.* Next, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 45.

After consideration of the record, the ALJ found that Plaintiff had the RFC to perform a full range of work at all exertional levels with the following non-exertional limitations: performing simple, routine, and repetitive tasks; the work environment must be free of fast-paced production requirements and routine workplace changes; occasional public contact and interaction with co-workers; and superficial contact with others, meaning no tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others, or being responsible for the safety and welfare of others. Tr. at 48. Following the RFC finding, the ALJ stated that Plaintiff was capable of performing past relevant work as a milking machine operator and sandblaster. Tr. at 52. The ALJ noted that this work did not require the performance of work-related activities precluded by Plaintiff's RFC. *Id.* Based on the above, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, from December 19, 2012, through the date of the decision. *Id.* at 54.

## IV. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

> 4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));
>
> 5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V.     STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937(citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (internal citation omitted)). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon

-10-

the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## VI.    LAW AND ANALYSIS

Plaintiff asserts that the ALJ's finding that he retained the RFC for a range of unskilled work lacks the support of substantial evidence. ECF Dkt. #10 at 16. After providing a summary of the substantial-evidence standard that is applied is Social Security cases, Plaintiff restates portions of the opinions submitted by the consultative examiners, Dr. Lyall, Dr. Saghafi, and Mr. Mohler. *Id.* at 16-19. Plaintiff states that the ALJ assigned significant weight to these three opinions, with the exception of Dr. Lyall's global assessment of functioning ("GAF") score of fifty, to which the ALJ assigned less weight. *Id.* at 19. Continuing, Plaintiff indicates that the ALJ noted that these opinions were consistent with the medical record and the RFC for simple, routine, and repetitive tasks in a low-stress work environment with few changes. *Id.*

Next, Plaintiff asserts "[t]o the extent the ALJ intended to adopt the [RFC] found by the state reviewing physicians, [the ALJ] did not." ECF Dkt. #10 at 19-20. Plaintiff also claims that "to the extent [the ALJ] intended to find a less-restrictive RFC than as found by the state reviewing physicians, substantial evidence does not support such a departure." *Id.* at 20. Continuing, Plaintiff states that the state agency reviewing physicians did not include any limitations with respect to job-related reading requirements, off-task time, absenteeism, or any special supervision he would require in order to minimize mistakes, remain on task, or adjust to workplace changes. *Id.* Plaintiff then cites to evidence that arose after his applications were denied initially and upon reconsideration. *Id.* at 20-21. Following the discussion of this evidence, Plaintiff claims that the ALJ did not account for his limitations with respect to: job-related reading requirements; the inability to tolerate "routine" or "few" workplace changes; and the requirement of special supervision. *Id.* at 22. Based on the above, Plaintiff asserts that

substantial evidence supports a finding of disability at step three or step five of the sequential evaluation process.[4] *Id.*

Defendant contends that substantial evidence supports the ALJ's RFC finding, stating that the ALJ relied on five separate medical opinions to formulate the RFC finding from: (1-2) the state agency psychological consultants, Dr. Johnston and Dr. Tangeman; (3) Dr. Lyall; (4) Mr. Mohler; and (5) Dr. Saghafi. ECF Dkt. #13 at 8-9. Additionally, Defendant avers that Plaintiff's challenges to the ALJ's findings lack merit because Plaintiff is doing nothing more than inviting the Court to re-weigh the evidence, which is not a proper basis for remand. *Id.* at 9 (citing *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)). Defendant also responds to each piece of evidence presented by Plaintiff that arose after his applications were denied initially and upon reconsideration. *Id.* at 10-14.

Plaintiff's arguments are without merit. As an initial matter, Plaintiff appears to assert that the ALJ intended to adopt portions of the opinions of the state agency reviewing physicians, but failed to do so properly. *See* ECF Dkt. #10 at 19-20. Specifically, Plaintiff states that the state agency psychological consultants found Plaintiff limited to understanding and remembering simple, one- to two-step instructions and infrequent changes that could be easily explained. *Id.* According to Plaintiff, the ALJ's RFC finding did not contain any limitations on his ability to understand or remember instructions, and merely found him limited to "routine" or "few" workplace changes. ECF Dkt. #10 at 20, n. 5; *See* Tr. at 112-14, 123-25,137-38, 148-49.

The ALJ did not state that he was adopting the opinions of the state agency psychological consultants. Tr. at 51. Instead, the ALJ indicated that he was assigning their opinions "significant weight." *Id.* The ALJ stated that the opinions of the state agency psychological consultants were "generally consistent with the above [RFC]..." Tr. at 51. Further, the ALJ did limit Plaintiff to simple, routine, and repetitive tasks, a limitation that is consistent with the

---

[4]Plaintiff does not put forth any explanation of how he meets or medically equals a listed impairment, as stated in 20 C.F.R. Pt. 404, Subpt. P, App. 1, despite asserting that substantial evidence supports a finding of disability at either step three or step five of the sequential evaluation. As such, Plaintiff fails to provide any explanation as to how the ALJ erred at step three of the sequential evaluation.

opinions of the state agency psychological consultants. *See* Tr. at 47-48. The Sixth Circuit has explained that simple work was consistent with jobs requiring a reasoning level of one, which includes the ability to carry out simple one- to two-step instructions. *Monateri v. Comm'r of Soc. Sec.*, 436 Fed.Appx. 434, 446 (6th Cir. 2011); *Dictionary of Occupational Titles,* 01 Level Reasoning Development ("Apply commonsense understanding to carry out simple one- to two step instructions..."). Likewise, the ALJ limited Plaintiff to a workplace free of routine changes, a limitation that is consistent with the opinions of the state agency psychological consultants. *See id.* There was no obligation imposed on the ALJ to adopt the exact language used in the opinions of the state agency psychological consultants or even adopt all of the limitations contained therein.

>Continuing, Plaintiff asserts:
>
>Substantial evidence does not support the state reviewing physicians' [RFC] capacity determinations, as they did not include any limitations with respect to job-related reading requirements, time off task or absenteeism, or any special supervision Plaintiff would need in order to minimize mistakes, to remain on task, or to adjust to workplace changes.

ECF Dkt. #10 at 20. In support of this argument, Plaintiff provides six bullet points citing evidence that arose after his applications were denied initially and upon reconsideration. *Id.* (citing Tr. at 319-20, 398-400, 451-52, 496-501, 691-92, 737, 764, 766, 789, 793-94, 809, 817, 835, 844-46). Additionally, Plaintiff lists evidence that he believes supports a finding of disability. *Id.* at 22.

All of the evidence cited by Plaintiff was available to the ALJ when the decision was issued on December 7, 2015. As such, Plaintiff has essentially asked the Court to re-weigh the evidence presented to the ALJ. This is not the proper standard of review. As explained above, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. Here, Plaintiff attempts to show that the ALJ's decision was not supported by substantial evidence by pointing to evidence that he believes shows he is disabled; however, the question is not whether evidence exists in the record upon which the ALJ could

-13-

have found plaintiff disabled, but instead whether the ALJ's decision finding Plaintiff not disabled is supported by substantial evidence.

The undersigned finds that the ALJ's decision is supported by substantial evidence. When presenting the RFC finding, the ALJ provided the following summary of Plaintiff's activities of daily living:

> Regarding activities of daily living, [Plaintiff] testified that on a typical day he cleans dishes, watches television, throws horseshoes, shoots his bow, eats meals, and helps his parents out at times. In addition, he said that he goes to bars, has fun with his friends, cooks and cleans, reads, and he mowed lawns this summer for about one month. Finally, [Plaintiff] reported that he had a girlfriend, but that they are no longer together.

Tr. at 48-49. Continuing, the ALJ provided a detailed discussion of the medical evidence in this case, summarizing Plaintiff's treatment with Dr. Stalker, Mr. Mohler, Dr. Saghafi, Dr. Lazzerini, and Dr. Kothari. *Id.* at 49-50.

After discussing the medical evidence, the ALJ turned to the opinion evidence. Tr. at 51. The ALJ explained that he was assigning significant weight to the opinions of the state agency psychological consultants, as discussed above, since the opinions were generally consistent with the RFC finding, Plaintiff's medical records, and the lack of treatment history, specifically noting the dearth of evidence of psychiatric hospitalizations or mental health treatment/counseling. *Id.* Continuing, the ALJ explained that significant weight was assigned to the majority of the opinion of Dr. Lyall because the opinion was generally consistent with the record as a whole and the assessments from Disability Determination Services ("DDS"), and Dr. Lyall was a mental health specialist who had the advantage of personally evaluating Plaintiff. *Id.* The ALJ then explained that less weight was assigned to the GAF score provided by Dr. Lyall since it was a vague statement of functional abilities that was inconsistent with Dr. Lyall's narrative statement and the medical record, which included a lack of formal treatment or significant mental health issues. *Id.*

Regarding Mr. Mohler's opinion, the ALJ indicated that the opinion was assigned significant weight as it was generally consistent with assessments from DDS and Dr. Lyall, and Mr. Mohler personally evaluated Plaintiff. Tr. at 51. The ALJ assigned significant weight to Dr.

Saghafi's opinion, explaining that it was consistent with the medical record. *Id.* Continuing, the ALJ indicated that no controlling weight was assigned to the opinion of Dr. Lazzerini, who assigned extreme limitations.[5] Tr. at 51. The ALJ stated that Dr. Lazzerini provided very little supporting evidence and did not provide an analysis, and that the opinion was inconsistent with the medical record as a whole. *Id.* A review of the record supports the ALJ's characterization of the opinion evidence in the instant case and the determination that the decision is supported by substantial evidence.

Finally, Plaintiff complains that the ALJ did not impose limitations regarding his: ability to understand instructions; job-related reading requirements; and need for special supervision and guidance. ECF Dkt. #10 at 22. Insofar as Plaintiff argues that the ALJ failed to adopt any limitation assessed by a treatment provider, he has not asserted that any of these treatment providers qualified as treating physicians under the regulations. *See* ECF Dkt. #10 at 18-22; ECF Dkt. #14 at 1-2. Since these treatment providers were not treating physicians, the ALJ was not obligated to provide "good reasons" when discounting their opinions. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); Social Security Rule 96-2p. Further, the ALJ was not required to specifically address every piece of evidence in the decision. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed.Appx. 496, 508 (6th Cir. 2006). The ALJ was under no obligation to adopt all of the limitations contained in the medical opinions presented in this case, such as the limitations regarding his ability to understand instructions, reading ability, and need for supervision and guidance. Rather, the ALJ was required to support the decision with substantial evidence. This requirement has been met. Accordingly, the ALJ's decision is supported by substantial evidence and Plaintiff's claim fails.

---

[5]Dr. Lazzerini's complete medical source statements that the ALJ refered to as "opinions." These medical source statements from Dr. Lazzerini are referred to collectively as his "opinion" herein. *See* Tr. at 51.

## **VII.    CONCLUSION AND RECOMMENDATION**

For the foregoing reasons, the undersigned RECOMMENDS that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case in its entirety with prejudice.


Date: March 1, 2018                               */s/George J. Limbert*
                                                                GEORGE J. LIMBERT
                                                                UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72; L.R. 72.3.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).